

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### AP-75,706
---

### DOUGLAS TYRONE ARMSTRONG, Appellant

### v.

### THE STATE OF TEXAS

---
### ON DIRECT APPEAL FROM CAUSE NO. CR-2095-06-G
### IN THE 370TH JUDICIAL DISTRICT COURT
### HIDALGO COUNTY
---

**KEASLER, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In January 2007, a jury convicted Douglas Tyrone Armstrong of capital murder.[1]

Based on the jury's answers to the special issues set forth in Texas Code of Criminal

Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Armstrong to

---

[1] TEX. PENAL CODE ANN. § 19.03(a)(2).

death.[2] After reviewing Armstrong's fourteen points of error on direct appeal,[3] we conclude that they are without merit. Accordingly, we affirm the trial court's judgment.

## Sufficiency of the Evidence

### Facts

On April 21, 2006, around 9:30 p.m., Laura Patricia Corona and Pilar Reyes witnessed a man attacking Rafael Castelan. Corona and Reyes were in a mini-van, and Reyes drove toward the attacker in an attempt to scare him away from Castelan. The attacker did not flee, but Castelan tried to escape by getting into the rear door of the mini-van. The attacker grabbed Castelan by the head and threw him to the ground; Corona heard Castelan's head hit the pavement. Corona then saw the attacker cut Castelan's neck and go through his pockets before he ran north through an alley. Corona called 911 and checked on Castelan. Castelan died at the scene. Forensic pathologist Dr. Fulgencio Salinas later determined that Castelan suffered multiple incised cuts to the neck and died from the resulting blood loss.

Officer Norma de la Rosa arrived at the scene first, followed by Sergeant Sebastian Guerrero. Both observed Castelan covered with blood and with a lacerated neck. Castelan's rear pocket had been ripped from his shorts, and his belongings were scattered on the ground. Detective Jose Elizondo, who was responsible for collecting evidence, found a bag of items

---

[2] TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(g).

[3] *Id*. at § 2(h).

from an H.E.B. grocery store, a cell phone, and a wallet on the ground near Castelan's body. There was blood inside the wallet, and its contents were strewn around the area.

Corona and Reyes described Castelan's attacker as a large black man, wearing a white T-shirt and blue jeans. The couple told the officers the direction in which the attacker had run. As other officers secured the scene, Guerrero went to search for the attacker.

The Sunshine Bar was located about three blocks north from where Castelan had been attacked. The back door of the bar was located in the same alley through which the attacker had fled. Bartender Cinthia Berenice Alanis Olvera told police that Armstrong had been at the bar for quite some time that day, playing pool and purchasing drinks for waitresses and female patrons. Castelan arrived at the bar later in the day and spoke with Armstrong for about half an hour. Castelan told Olvera that he was going to a nearby H.E.B. to get something for Armstrong. Olvera never saw Castelan again.

Armstrong told Olvera and another patron that he had run out of money and showed them his empty wallet. He then left the bar and returned later through the back door. When Armstrong returned, he was shaking, sweating, and acting nervous. Bar patron Darin Douglas watched Armstrong stand at the bar and count out paper currency "under the bar" before buying a beer. Olvera remembered that Armstrong used a five-dollar bill. Armstrong went into the men's restroom where Mr. Douglas saw Armstrong take off his white T-shirt and pour beer over his fingers. Mr. Douglas believed that this odd because there was a sink

right outside the door of the men's restroom. Mr. Douglas then returned to the bar and began playing pool. According to Olvera, the police arrived almost immediately thereafter.

When Sergeant Guerrero entered the bar through the back door, he looked around and saw Mr. Douglas, who matched the description given by Corona and Reyes. He asked a patron sitting near the back door whether anyone had entered it recently. Upon learning that two men had, Guerrero called for backup. Officers Ortega, Peña, and Salinas then came to the bar.

While Ortega stood at the door, Salinas detained Mr. Douglas at the pool table. Guerrero and Peña went into the men's restroom where they found Armstrong and a Hispanic man. Armstrong was sweating and putting on a dark colored T-shirt when the officers entered the restroom. Armstrong also matched the description of the attacker. Guerrero and Peña detained both men. According to Olvera, when Armstrong entered the restroom, he had been wearing a white T-shirt. Guerrero observed a white T-shirt covered with blood on the floor near the urinal just a few feet from Armstrong. Officers also noticed dark stains that appeared to be blood on Armstrong's blue jeans. Crystal Dawn Anderson from the Texas Department of Public Safety Crime Lab later positively identified the stains as blood. She also determined that the DNA profiles developed from the blood on the T-shirt and jeans were consistent with Castelan's DNA profile. A DNA profile developed from scrapings taken from the neck of the white T-shirt matched Armstrong's DNA profile.

Officers placed Douglas, Armstrong, and the Hispanic male in separate patrol cars outside the bar. De la Rosa escorted Corona and Reyes to the Sunshine Bar so that they could view the three men. Both Corona and Reyes identified Armstrong as Castelan's attacker. Officer Salinas then checked Armstrong's pockets for identification. He found a driver's license, "paperwork and some money." Officer Salinas noted that the paperwork was folded, but he did not know what kind of paperwork it was. Sergeant Guerrero then took Armstrong to the county jail for booking.

While booking Armstrong, Jailer Joshua Edwards found Castelan's Medicaid form in Armstrong's possession. Though the item is referred to as a Medicaid card or receipt by both parties and in the record, it is an 8½" by 11" paper with Castelan's name, Medicaid identification number, date of birth, and eligibility dates typewritten on it. Edwards removed the form from Armstrong's left-rear pocket along with Armstrong's pay stub. The two items were folded together. The Medicaid form, as well as forty-one dollars in paper currency, were blood-stained. Anderson later determined that the DNA profiles obtained from the blood were consistent with Castelan's DNA profile. Edwards did not list the Medicaid form on the booking sheet because it would not be returned to Armstrong when he was released from the jail.

Three days after the offense, on April 24, 2006, while conducting a further search of the area surrounding the crime scene, officers found a blue box-cutter knife in a grassy area near the rear entrance of the Sunshine Bar. The knife was fashioned like a pocket knife, and

officers observed blood on the blade. Anderson later determined that the DNA profile obtained from the blood was consistent with Castelan's DNA profile. Armstrong's girlfriend, Cynthia Losoya, told police that Armstrong "always" carried a blue box-cutter knife.

**Analysis**

In points of error one and two, Armstrong contends that the evidence is legally and factually insufficient to support his conviction for capital murder. In point of error three, Armstrong complains that the trial judge erred by denying his motion for directed verdict. Armstrong argues that the State "failed to establish beyond a reasonable doubt that [he] intentionally committed this murder in the course of committing or attempting to commit a robbery." Armstrong specifically argues that: (1) Corona did not testify that Armstrong robbed Castelan, and Reyes testified that he did not see whether Armstrong had a weapon in his hand; (2) the State did not prove robbery or attempted robbery because Officer de la Rosa did not include anything in her report about Castelan having been robbed; and (3) the timeline of events makes it factually impossible for the offense, investigation, and arrest to have taken place as presented by the prosecution.

Under *Jackson v. Virginia*, when deciding whether evidence is legally sufficient to support a conviction, we assess all of the evidence in the light most favorable to the verdict to determine whether "*any* rational trier of fact could find the essential elements of the crime

beyond a reasonable doubt."[4]   Evidence is factually insufficient when, although legally sufficient under a *Jackson* analysis, the evidence is "so weak" that the verdict "seems clearly wrong or manifestly unjust" or "against the great weight and preponderance of the evidence."[5]   A factual sufficiency review is "barely distinguishable" from a *Jackson v. Virginia* legal sufficiency review.[6]   We review a challenge to the denial of a motion for directed verdict as a challenge to the legal sufficiency of the evidence.[7]

A person commits the offense of capital murder if he commits murder in the course of committing or attempting to commit robbery.[8]   As such, capital murder encompasses murder that occurs in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the robbery.[9]   A person commits robbery "if, in the course of committing theft . . . and with the intent to obtain or maintain control of the property, he (1) intentionally, knowingly or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or

---

[4]   443 U.S. 307, 319 (1979) (emphasis in original).

[5]   *Watson v. State*, 204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006).

[6]   *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007).

[7]   *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

[8]   TEX. PENAL CODE ANN. § 19.03(a)(2).

[9]   *Lincecum v. State*, 736 S.W.2d 673, 680 (Tex. Crim. App. 1987).

death."[10] Theft requires proof of an unlawful appropriation of property with intent to deprive its owner of it.[11] The intent to steal may be inferred from actions or conduct.[12] Where a defendant is charged with committing murder in the course of committing a robbery, "[e]vidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder."[13]

Castelan died from a laceration to his neck. Corona testified that Armstrong cut Castelan's neck and went through his pockets. Castelan's belongings and the contents of his wallet had been scattered on the ground near his body. When Guerrero encountered Armstrong in the Sunshine Bar, Armstrong was changing shirts and was wearing jeans covered with blood. A bloody T-shirt was on the floor nearby. Olvera testified that before Armstrong left the bar, he showed her his empty wallet. After Castelan was murdered, Armstrong was seen by a bar patron counting money under the bar, and Armstong paid for a beer with a five-dollar bill. Castelan had also told Olvera that he was going to the H.E.B. to get something for Armstrong. When Armstrong was booked into the jail, Edwards seized forty-one dollars; Edwards also found Castelan's Medicaid form in Armstrong's possession.

---

[10] Tex. Penal Code Ann. § 29.02(a)(2).

[11] Tex. Penal Code Ann. § 31.03.

[12] *Johnson v. State*, 541 S.W.2d 185, 187 (Tex. Crim. App. 1976).

[13] *Shuffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006) (original emphasis removed).

Both had blood on them. The DNA profiles developed from the blood found on Armstrong's jeans, the white T-shirt, the box-cutter knife, the Medicaid form, and the paper money were consistent with Castelan's DNA profile.

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found that Armstrong committed this murder in the course of committing or attempting to commit a robbery. Further, the evidence is not so weak that the jury's determination is clearly wrong and manifestly unjust. Likewise, the evidence is factually sufficient because the verdict is not against the great weight and preponderance of the evidence. Because the evidence that Armstrong murdered Castelan in the course of committing or attempting commit robbery is both legally and factually sufficient, points of error one through three are overruled.

## Denial of Motion for Continuance

In point of error four, Armstrong alleges that the trial judge erred in denying his fourth continuance motion and proceeding despite his announcement of "Not Ready." In points of error five and six, Armstrong complains that the trial judge tacitly removed trial counsel from his defense by denying counsel more time to conduct a complete mitigation investigation in violation of the Sixth and Fourteenth Amendments. In points of error seven and eight, Armstrong alleges that the trial judge tacitly removed trial counsel from his defense in violation of Article I, Section 10 of the Texas Constitution and Article 26.052 of the Texas Code of Criminal Procedure.

All five of these allegations relate to the fourth continuance motion and the announcement of "Not Ready" filed by second-chair trial counsel Nereyda Morales-Martinez on November 6, 2006, the morning that individual voir dire was set to begin. Morales-Martinez explained to the trial judge that the mitigation expert had not completed the investigation and that she had not had the opportunity to determine what sorts of experts would be needed. This information, according to Morales-Martinez, was important for voir dire.

During the discussion between both counsel and the trial judge, the judge learned that Morales-Martinez was not responsible for conducting voir dire. First chair Rogelio Garza was responsible for voir dire and for the guilt phase of trial. Morales-Martinez was responsible for the punishment phase and the mitigation investigation. Garza told the trial judge that he was ready to proceed with individual voir dire. The record shows that the trial judge informed counsel that more time would be granted, if necessary, before the beginning of trial.

At the hearing on Armstrong's motion for a new trial, Garza testified that he reiterated to the trial judge that he was ready to proceed with individual voir dire, and he pointed out that the mitigation investigation could continue. Garza testified that if more time had been needed for the mitigation investigation before the punishment phase, then more time could have been requested at that time. Counsel acknowledged that the defense did not request any further continuances.

Garza also testified that he was aware of the general areas of mitigation that were appropriate in this case and that he was able to develop hypotheticals to present to potential jurors. For that reason, Garza testified, he did not urge the motion for continuance. Morales-Martinez testified that Garza informed her that he had withdrawn the motion for continuance.

Because the record shows that lead counsel withdrew the continuance motion and that it was not re-urged at a later time, Armstrong has not preserved these complaints for appellate review.[14] Points of error four through eight are overruled.

**Investigation and Presentation of Mitigating Evidence**

In point of error nine, Armstrong complains that the trial judge erred in denying his motion for a new trial. Armstrong argues that the evidence presented during the hearing was more than sufficient to show that he was deprived of effective assistance of counsel. Therefore, he claims, the trial judge abused his discretion in denying his motion for a new trial. In his motion and during the hearing, Armstrong's arguments regarding effectiveness of counsel addressed the presentation of mitigation evidence during punishment. Armstrong argued then, as he does now, that trial counsel failed to fully investigate and present substantial mitigating evidence to the jury.

In point of error ten, Armstrong alleges that he was denied the right to effective assistance of counsel when trial counsel failed to investigate and present substantial mitigating evidence to the sentencing jury. In point of error eleven, Armstrong claims the

---

[14] T EX. R. APP. P. 33.1.

prohibition against cruel and unusual punishment was violated when he was subjected to the death penalty without presentation of substantial mitigation evidence. In points of error twelve and thirteen, Armstrong argues that trial counsel's ineffectiveness denied him due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution.

To prevail on his claims, Armstrong must first show that the performance of trial counsel was deficient.[15] Specifically, Armstrong must prove, by a preponderance of the evidence, that the representation provided by counsel fell below the objective standard of professional norms.[16] Second, Armstrong must show that this deficient performance prejudiced his defense.[17] As we have previously explained, Armstrong bears the burden of showing "a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[18] A "reasonable probability" is one sufficient to undermine confidence in the outcome.[19] In assessing a claim of ineffective assistance, we "must indulge a strong presumption that counsel's conduct [fell] within the wide range of

---

[15] *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

[16] *Mitchell*, 68 S.W.3d at 642.

[17] *Strickland*, 466 U.S. at 687.

[18] *Mitchell*, 68 S.W.3d at 642.

[19] *Strickland*, 466 U.S. at 687; *Mitchell*, 68 S.W.3d at 642.

reasonable professional assistance."[20]  While a claim of ineffective assistance of counsel generally may not be addressed on direct appeal because the record on appeal is not sufficient to assess counsel's performance,[21] the record in this case was developed at the hearing on the motion for a new trial.

When asked why the defense called no expert witnesses during the punishment phase, Garza testified that the decision was made not to use a report generated by Dr. Pinckerman, who evaluated Armstrong, because the report was not favorable to the defense.  Morales-Martinez explained that Dr. Pinckerman believed that Armstrong had not been cooperative during the evaluation, thus causing the results to be invalid.  When Morales-Martinez advised Armstrong that he should be retested, Armstrong told her that his answers would not change with retesting.  Because of Armstrong's response, counsel determined further evaluation by other experts would not be fruitful.

Garza also testified that three witnesses were called to testify for the defense during the penalty phase of trial: Armstrong's girlfriend, his minister, and his sister.  Armstrong's girlfriend, Cynthia Losoya, testified that she considered herself to be Armstrong's common-law wife, although they had lived together for only four and a half months.  Losoya stated that Armstrong had been happy to learn she was pregnant and that she had given birth to a boy while Armstrong was in jail.

---

[20]  *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citing *Strickland*, 466 U.S. at 689).

[21]  *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

Armstrong's minister, David Ray, testified that before the offense, he counseled Armstrong about finding employment and offered him encouragement. Ray testified that Armstrong seemed happy with the job he found as a "fork truck" operator. Ray also testified that he never had any problems with Armstrong and that he had never been asked to counsel Armstrong and his girlfriend about any domestic issues. Following the offense, Ray visited Armstrong in jail twice a month.

Armstrong's sister, Shiela Armstrong, described the relationship between Armstrong and his father, Douglas Clark, as abusive. According to Shiela, Clark would put Armstrong in an empty room, padlock the door, and deny him food. On days when he was not locked in the room, Armstrong would hide in the attic until his mother returned home. Shiela testified that Clark would beat Armstrong with old toy train tracks, broom sticks, and extension cords, sometimes to the point that Armstrong would bleed. Shiela also testified that their mother's side of the family mistreated Armstrong because they believed he was too much like his father. Additionally, Armstrong witnessed his father physically abuse his mother.

Shiela testified that Armstrong was in special education classes in school and that he met with a "psychiatrist and a counselor and stuff weekly" because he was slow. When Armstrong "went into juvy, psychiatrists and all that stopped." Armstrong entered the juvenile-justice system around the age of twelve, and at age fifteen or sixteen, he was sent

to prison for ten years. Shiela also told the jury that Armstrong had always been employed and supported his children when he was not incarcerated.

During the motion for new trial hearing, Gilda Bowen, the defense's mitigation specialist, told the trial judge, "Based on what little [she] could find out about [Armstrong's] family history," she believed that Armstrong was "borderline" mentally retarded. Bowen told the trial judge that if she had gone to Alabama and found the mental-health institute where Armstrong received counseling and visited the school(s) where he had been in special education classes, she might have found evidence of mental-health issues and possible evidence of mental retardation. Bowen also testified that more time was required to find more experts, perhaps even a "genetics expert to look at the biology of his relationships and look at other forms of abuse."

After hearing testimony, the trial judge asked counsel, "So having the benefit of 20/20 [hindsight], is there anything in particular that you would have done differently?" Morales-Martinez told the judge that she would have delved more into possible retardation issues despite Dr. Pinckerman's report. Morales-Martinez also confirmed to the judge that there were no other out-of-town witnesses that the defense had requested but were unable to get to court. When the judge asked trial counsel whether there was any other evidence that could have been presented in mitigation, counsel could not point out any factual information that could have been put before the jury. Likewise, Bowen was not able to point out any additional factual information that could have been presented during the punishment phase.

Armstrong nevertheless asks this Court to speculate that additional mitigation evidence does exist. However, if we were to "speculate about the existence of further mitigating evidence, then [we] just as logically might speculate about the existence of further aggravating evidence."[22] Ineffective assistance of counsel claims cannot be supported by retrospective speculation; they must be "firmly founded in the record."[23]

Armstrong has not shown that there exists any further "substantial" mitigation evidence that could have been presented to the jury. Thus, the trial judge did not abuse his discretion in denying Armstrong's motion for new trial. Further, Armstrong did not meet his burden of demonstrating both deficient performance and prejudice as required by *Strickland* or a violation of his rights to due process and to be free from cruel and unusual punishment. Points of error nine through thirteen are therefore overruled.

## Motion to Suppress

In point of error fourteen, Armstrong alleges that the trial judge "erred by denying [his] motion to suppress the evidence obtained as a result of his detention because there existed no reasonable suspicion to conduct the investigative detention." Within the body of his argument, Armstrong changes it. He does not contend that he was illegally detained temporarily; instead he claims that he was improperly arrested without a warrant. Armstrong

---

[22] *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).

[23] *Id.* (quoting *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999)).

argues that he was arrested when he was handcuffed and placed in the back of a patrol car for identification purposes.

During the hearing on Armstrong's suppression motion, Guerrero testified that after arriving at the crime scene, he went in search of the attacker in the direction indicated by the witnesses. Guerrero entered the Sunshine Bar through the back door and learned from a patron that two people had recently entered the bar through that door. Guerrero called for backup and, when other officers arrived, one officer detained a man playing pool, who matched the description of the suspect. Guerrero, with another officer, entered the men's restroom where they encountered a Hispanic man and Armstrong. Armstrong also matched the description of the suspect. Armstrong was sweating and in the process of changing into a dark colored T-shirt. His jeans were covered in blood as was a white T-shirt lying on the floor nearby. Guerrero testified that, at that point, he and the other officer detained Armstrong and the Hispanic man for investigative purposes. All three suspects were handcuffed and each was placed into the back seat of a separate patrol car for identification purposes. Guerrero testified that once Armstrong was identified by Corona and Reyes, Armstrong was arrested, and the two other men were released.

An officer has the right to briefly detain and investigate a person when the officer has a reasonable suspicion that the person is involved in criminal activity.[24] Here, Guerrero had reasonable suspicion that Armstrong had murdered and robbed Castelan. The murder had

---

[24] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

just occurred when Guerrero encountered Armstrong, who matched the description of the assailant. Armstrong was still wearing jeans that were covered with blood and he had just taken off the bloodied white T-shirt.

Armstrong argues that because Guerrero placed him in handcuffs at that time, he was under arrest. Armstrong is correct that he was not free to go at that time; however, it was not because he was under arrest—it was because he was temporarily detained. Under *Terry v. Ohio*, a temporary detention, in which a suspect is not free to leave, is permissible while police investigate whether a crime has been committed by that suspect.[25] A *Terry* detention is not a custodial arrest, and the use of handcuffs does not automatically convert a temporary detention into an arrest.[26]

The totality of the circumstances demonstrates that Guerrero had reasonable suspicion to detain Armstrong while investigating Castelan's death. That the other two men were released when they were not identified supports the conclusion that Armstrong was only detained when he was initially placed in handcuffs. Once he was positively identified as Castelan's attacker, this, along with the other information known to the officers, gave police probable cause to arrest Armstrong. The trial judge did not err in denying Armstrong's motion to suppress the evidence obtained as a result of his detention. Point of error fourteen is overruled.

---

[25] *Id*. at 30-31.

[26] *See State v. Sheppard*, 271 S.W.3d 281, 289 (Tex. Crim. App. 2008).

We affirm the judgment of the trial court.

DELIVERED: January 27, 2010
DO NOT PUBLISH